## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JANINE BROMLEY,

       **Plaintiff,**

vs.                                                        No. CIV 02-0999 RLP/LFG

BUTT, THORNTON, BAEHR, P.C. and CONTINENTAL
CASUALTY COMPANY a/k/a CNA GROUP LIFE
ASSURANCE COMPANY a/k/a/ CNA INSURANCE
COMPANIES,

       **Defendants.**

### <u>MEMORANDUM OPINION AND ORDER</u>

**This matter** comes before the Court on Defendant Insurer's Motion for Judgment on the

Administrative Record or in the Alternative for Summary Judgment [Docket No. 22].   Plaintiff's

Complaint, filed pursuant to the Employee Retirement Income Security Act of 1974 ["ERISA"

herein] seeks a declaration that she has been disabled under the terms of a Group Long Term

Disability Policy ["Plan" herein] provided to her as an employee of Butt, Thornton, Baehr, P.C. The

Plan is an insurance contract purchased by the employer from Defendant Continental Casualty

Company a/k/a CNA Group Life Assurance Company a/k/a CNA Insurance Companies ["CNA"

herein].   CNA is the administrator of the Plan.  For the reasons stated herein, Defendant's Motion

is Denied and Judgment on the Record is granted in favor of Plaintiff.

### I.

Plaintiff urges the Court to consider two documents that were not reviewed by CNA at  the

time of its final decision denying benefits under the Plan, a letter from Plaintiff's supervisor at work

(attached to Plaintiff's Complaint Docket No. 1, Exh. 1) and letter decision awarding of disability

benefits to Plaintiff by the Social Security Administration (AR 23-32).  This Court is prohibited from

considering this evidence.

> If a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of the administrator's failure to consider this evidence . . . In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision.

*Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 381 (10th Cir. 1992).

## II.

The Plan gives CNA, as plan administrator, discretion to determine eligibility for benefits or to interpret the terms of the policy.[1]  Accordingly CNA's decision to deny benefits must be upheld unless it was arbitrary and capricious.  *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825-826. (10th Cir.1996).  "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith and conflict of interest by the fiduciary."  *Caldwell v. Life Insurance Co. of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002) *citing Sandoval*, 967 F.2d at 380 n. 4 and *Charter Canyon Treatment Center v. Pool Co.,* 153 F.3d 1132, 1135 (10th Cir. 1998).  Under the arbitrary and capricious standard of review, a plan administrator's decision may not be overtured if the decision "was reasonable, given the terms of the plan, and made in good faith."  *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1292 (10th Cir. 1999).  "However, if a plan administrator is operating under a conflict of interest, 'the court may weigh that conflict as a factor in determining whether the plan administrator's actions were arbitrary and capricious.'"  *Pitman v. Blue Cross and Blue Shield of Oklahoma*, 217 F.3d 1291, 1295 (10th Cir. 2000) (*quoting Charter Canyon Treatment Center,* 153 F.3d at 1135).  Where a conflict of interest exists, a less deferential

---

[1]"When making a benefit determination under the policy, *We* have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy."  (AR 8).

standard, "sliding scale" standard of review is utilized, under which the deference accorded to the decision of the administrator decreases in proportion to the severity of the conflict. *Pitman, id.* "The conflict ... is weighed as one factor in determining whether the plan administrator's decision was arbitrary and capricious." *Id.*

Plaintiff claims that CNA was operating under a conflict of interest because it is both the administrator and the insurer of the Plan. I agree. As the insurer of the plan, CNA had "a financial interest in denying claims in order to remain economically viable as well as competitive within the insurance industry. *Caldwell*, 287 F.3d at1283. As a result, in its dual capacity as both insurer and administrator, CNA was faced with "an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound." Id. n. 4. *See also Caldwell v. Life Insurance Co. of North America 287 F.3d at 1283* and *Coday v. Metropolitan Life Insurance Co.,* 183 F.Supp. 2d 1332, 1337 (D. Kan. 2002). Accordingly, I will consider CNA's conflict of interest as one factor in determining whether the denial of disability benefits to Plaintiff was arbitrary and capricious.

Although the Tenth Circuit has resolved ERISA suits in a summary judgment posture in the past, I do not believe that summary judgment is the proper means by which to assess an ERISA plan administrator's denial of benefits under an arbitrary and capricious standard of review. The Tenth Circuit has held that motions for summary judgment are inconsistent with standards for judicial review of actions in which the court is confined to the administrative record in its analysis, noting that in evaluating such administrative actions, a trial court effectively functions as an appellate court and should govern itself by referring to the Federal Rules of Appellate Procedure. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir.1994) (Kane, J., sitting by designation). *Olenhouse* focused on the judicial review of administrative agency decisions. I find that its reasoning

3

is equally applicable to suits seeking review of the denial of ERISA benefits that are limited in their scope to the administrative record.

III.

Plaintiff was initially diagnosed with multiple sclerosis in 1982.  She was hospitalized in December of that year for a three day episode of double vision, and with abnormalities in her cerebral spinal fluid.  (AR 357-359).  Her double vision resolved, and as of March 1986, she had no clinical evidence of multiple sclerosis, although she continued to complain of headaches which were thought to be caused by tension or muscle contraction.  Id.

Plaintiff was employed  as a paralegal from 1988 until March 3, 2000, a job which required reading, research, typing (data entry), filing, copying, telephone and trial preparation. (AR. 507).  In 1991, an MRI of her brain disclosed multiple cerebral matter lesions along the lateral ventricles, consistent with a clinical diagnosis of multiple sclerosis.  (AR 355).  Because all neurological examinations performed were normal, Plaintiff's treating neurologist, Dr. Freedman, did not feel a definite diagnosis of multiple sclerosis could be made.  (AR 354).  Dr. Freedman evaluated Plaintiff again in January 1993 for complaints of headache and memory dysfunction. (Tr. 512-513).  Her neurological examination was again normal.  He again felt her headaches were from muscle contraction, not from multiple sclerosis.  He recommended weaning from prescription pain medications, EEG and neuropsychological testing.  In May of 1999, Plaintiff was seen by Dr. Daniel Shibuya, a neurologist, for complaints of increased headache pain, memory difficulties and concentration problems.  Her neurologic exam was again normal.  Dr. Shibuya felt Plaintiff's memory and concentration problems were likely due to  chronic pain and/or the narcotic medication she took to address that pain, and initiated treatment for her pain.  (AR 229).

4

Plaintiff applied for benefits under the Plan on July 1, 2000, stating that she had been unable to perform her job functions and duties since March 3, 2000, because of symptoms of multiple sclerosis. (AR 412). The Plan defines disability as being "continuously unable to perform the Material and Substantial duties of Your Regular Occupation and 2) not working for wages in any occupation for which you are or become qualified by education , training or experience. (AR 10). When interviewed on August 20, 2000, Plaintiff stated that disability was due to decreased vision affecting her ability to read, impaired memory and headaches. (AR 490). On September 1, 2000, CNA began paying disability benefits to Plaintiff, pending further review of her claim. (AR 131). On September 26, 2000, Plaintiff's work supervisor confirmed that Plaintiff had problems seeing or remembering what she was told to do, and that prior to this had been a very good employee. (AR 485, 100).

Plaintiff underwent MRI of the brain on February 21, 2000, which indicated demyelinating disease such as multiple sclerosis. (Tr. 198). Plaintiff was subsequently examined by Janice Maldonado, M.D, a staff neurologist at the University of New Mexico, Multiple Sclerosis Specialty Clinic, on March 16, 2000. (Tr. 287-289). Because Plaintiff's neurological examination was entirely normal, Dr. Maldonado diagnosed possible multiple sclerosis. Dr. Maldonado reviewed Plaintiff's MRI's from 1996 and 2000 noting "[n]o interval changes evidence with very minimal number of high intensity signal white matter lesions scattered mainly in the centrum semiovale." (AR 287). She felt that Plaintiff suffered from chronic atypical headaches that were "confounded by rebound factor due to narcotic overuse,"[2] and recommended evaluation by a headache specialist. She also stated that

_____

[2]Dr. Maldonado noted that Plaintiff was currently taking Percocet daily for relief of headache pain. (AR 287).

Plaintiff should be evaluated annually "given that her multiple sclerosis condition can evolve." (AR 289).

In April of 2000 Plaintiff was referred to Thomas Carlow, M.D., a neuro-ophthalmologist, by her treating ophthalmologist, Mark Chiu M.D. Dr. Carlow's examination documented bilateral macular degeneration, dry eyes and keratitis despite use of artificial tears and some decrease in vision he felt was secondary to prior LASIK surgery. (AR. 269-270). Her near vision, however, was normal. He subsequently recommended use of glasses to correct her far vision. (AR 271). In June of 2000, Dr. Chiu documented the presence of early cataracts. (AR 267).

Plaintiff returned to Dr. Shibuya in August, September, October and November 2000. (AR 225, 223, 296, 297). He stated that "MRI of her head, prior lumbar puncture and evoked potential studies . . .are most consistent with multiple sclerosis" and placed her on medication for that disease. He also placed her an a beta blocker for treatment of chronic headaches, since prior medication regimens had not been effective. Finally, he documented moderate degenerative facet changes at L4-5 and L5-S1, and mild C6-7 disk herniation with mild stenosis without significant cord compression.

CNA provided Plaintiff's medical records to Dr. Eugene Truchelot, a board certified internist, for review.[3] Dr. Truchelot summarized Plaintiff's medical complaints, test results and diagnoses in a letter dated May 11, 2000. (AR 138-142). He concluded that the medical information of record did not clearly demonstrate a functional impairment that would have precluded Plaintiff from

---

[3] Dr. Truchelot's affiliation with CNA, if any, is not clear from the administrative record. CNA states in its Reply Brief that there is no evidence that Dr. Truchelot was a CNA employee. (Docket No. 26 at 3). He is referred to as an independent medical consult(ant) or review(er) by CNA personnel in claims activity sheets (AR 95-96). However, in AR 251, a document titled CNA Universal Physician Review Form, he is referred to as "Dr. T," and is asked to conduct an on-site paper file review. According to the form, such reviews are conducted by "In-House physicians only."

performing the sedentary occupation of paralegal, that Plaintiff may have been incapacitated on a temporary basis due to headache, that despite her diagnosis of multiple sclerosis, testing did not disclose any  significant neurological deficit, and that her vision problems would not preclude work because her near vision was normal.  (Id.).  Importantly, however, he did not offer an opinion as to Plaintiff's claimed cognitive impairment, stating that her cognitive function would have to be assessed by neuropsychological testing elsewhere.  (AR. 141).

Dr. Truchelot reviewed additional records in a letter report dated September 11, 2001. (AR 132-133).  These records documented diagnosis and/or treatment for chronic headache,  mild bilateral macular degeneration, early bilateral cataracts, dry maculopathy, fluctuating visual acuity of unknown etiology,  guttate psoriasis, right shoulder rotator cuff syndrome, cervical disk disease with small central disk herniations at C5-6 and C6-7 with mild spinal stenosis, lumbosacral facet arthropathy, Hashimoto's thyroiditis and multiple sclerosis.  (AR. 132-133).  Dr. Truchelot also considered Plaintiff's reported daily activities[4].  Based on this information, Dr. Truchelot indicated that despite multiple diagnoses which could be expected to impact on the musculoskeletal system, Plaintiff could still preform medium level work.  (Tr. 133).  Again, he offered no opinion regarding her cognitive abilities.

Based on the evidence reviewed, CNA stopped paying disability benefits to Plaintiff as of October 31, 2001.  (AR.  128-129).

Dr. Shibuya referred Plaintiff to Stephen Chiulli, PhD, a neuropsychologist, for testing.  Dr.

---

[4]Daily activities were listed as driving an automobile 11 miles into town, using a computer for 30-60 minutes a day, mowing the lawn, doing laundry and ironing, going out for lunch with friends, grocery shopping once a week, shopping at other stores with her husband, currently staining the exterior of he house for a couple of hours a day and recently shooting a gun which had been a prior hobby.  (Tr. 133, referring to AR 142-143).

Chiulli's report is dated January 2, 2002. (AR 70-76). Based on interview, review of medical records and testing, Dr. Chiulli diagnosed Organic Mental Disorder with areas of severe impairment. Tests demonstrated that her current intellectual functioning was significantly lower than her estimated premorbid intellectual functioning (AR 73, 76), and that she had suffered losses in memory, attention, expressive language skills, motor skills with her dominate right hand and sensory processing on her right side.

Plaintiff appealed the termination of her disability benefits and denial of her claim on February 7, 2002, submitting Dr. Chiulli's report and the report from a vocational rehabilitation specialist, Ken Williams. (AR 61-63). Mr. Williams stated that the combination of Plaintiff's her cognitive losses and headaches made her unemployable. (AR 65-69). .

CNA had Dr. Chiulli's and Mr. Williams reports reviewed by an in-house registered nurse. (AR 61, 59). It is upon this review that CNA denied Plaintiff's appeal. The reviewer was asked to address three issues: 1) whether the restrictions and limitations were appropriate and supported, 2) whether the information supported an inability to perform regular work activities beyond October 31, 2001 and 3) whether Plaintiff was capable of any work at the present time. (AR 61). The reviewer failed to address the second issue:

> Info received indicated EE (employee) w/ dx of MS resulting in neuropsych eval to examine the effects of MS on her cognition and memory. Dr. Chiulli determined that EE "experienced losses in memory & attention due to demyelinating type disorder (MS)." He goes on to cite that "EE demonstrated premorbid intellectual development in the high average range and the current performance is frequently more than a standard deviation below probable premorbid levels (see report)." However, this does not preclude EE from performing sedentary activity. Impression remains unchanged from previous NCM Impression."

(AR 59).

The reviewer, and therefore CNA, accepted the limitations set forth in Dr. Chiulli's evaluation, and determined that such limitation would not prevent Plaintiff from performing sedentary work, without addressing the impact of those limitations on Plaintiff's job as a paralegal.

## IV.

CNA did not apply the correct standard in assessing whether Plaintiff was disabled. Plaintiff was a "Class 2" employee under the Plan[5]. A Class 2 employee meets the definition of disabled if she is continuously unable to perform the *"Material and Substantial Duties of [her] Regular Occupation;"* and is not working for wages in any occupation. (AR 10). This standard does not change until after benefits have been paid for 24 months, at which time Plaintiff's ability to perform work other than her regular occupation becomes relevant. CNA's reliance on irrelevant standards renders its decision to deny disability benefits under the Plan arbitrary and capricious. *Caldwell*, 287 F.3d at 1284.

## V.

Defendant's Motion for Judgment on the Administrative Record or in the alternative for Summary Judgment is denied. The Court has conducted a full review of the Administrative Record and finds that CNA's decision to deny disability benefits to Plaintiff was arbitrary and capricious.

**Accordingly, it is ORDERED** that the Plaintiff is granted Judgment on her Complaint.

**It is further ORDERED** that the Parties shall meet and confer on or before **June 25, 2003** to determine the amounts owed by the Defendant to the Plaintiff in light of the Court's ruling herein. If there is a dispute as to the amount, the parties shall file a statement as to their respective positions

---

[5]The Plan defines "Class 2" employees as active, actively working, full-time employees (working a minimum of 30 hours a week), excluding Attorneys and Administrator, who have completed a required waiting period. (AR 9).

9

with appropriate supporting affidavits on or before **July 7, 2003.** If there is no dispute, Plaintiff shall

submit a proposed judgment to the Court on or before **July 7, 2003.**

      **IT IS SO ORDERED.**

_____

**Richard L. Puglisi**
**United States Magistrate Judge**
**Sitting by Designation**
